871 So.2d 283 (2004)
Angela APOSTOLICO, etc., Appellant,
v.
ORLANDO REGIONAL HEALTH CARE SYSTEM, INC., etc., Appellee.
No. 5D03-1505.
District Court of Appeal of Florida, Fifth District.
March 26, 2004.
*284 Gregorio A. Francis of Morgan, Colling & Gilbert, P.A., Orlando, for Appellant.
Bradley P. Blystone of Mateer & Harbert, P. A., Orlando, for Appellee.
ORFINGER, J.
Angela Apostolico, as personal representative of the Estate of Virgil Apostolico, appeals a final order dismissing with prejudice her wrongful death medical malpractice complaint for failure to comply with the presuit screening requirements of Florida's Medical Malpractice Act, sections 766.201-.212, Florida Statutes (2002).[1] The dismissal was based on the trial court's ruling that Apostolico's medical expert was not qualified to render the opinion that accompanied her notice of intent to initiate medical malpractice litigation. On appeal, Apostolico argues that the trial court erred in dismissing her action because (1) her notice of intent to initiate litigation and corroborating affidavit sufficiently placed Orlando Regional Health Care System, Inc. ("ORMC") on notice of the allegations of the medical negligence action to allow a reasonable investigation of the matter; (2) the trial court employed the wrong standard in evaluating the presuit affidavit; and (3) there were other, less severe sanctions available for any alleged violations of the presuit requirements. For the reasons that follow, we reverse.
The complaint alleged that Virgil Apostolico, a 73-year-old man, went to ORMC's emergency department, complaining of chest pain. He was admitted to the telemetry unit of the hospital to rule out a myocardial infarction and was advised to have a venous access port, known as a Peripherally Inserted Central Catheter (PICC line), inserted to receive antibiotics he required due to a urinary tract infection. The hospital record for the procedure performed on November 8, 2000, noted the placement of a "4 French PICC line" by Cindy Adams, a registered nurse. A PICC line, such as the one utilized on Virgil, is inserted into a vein in a patient's arm and ends at the superior vena cava. Somehow, in Virgil's case, the PICC line looped in the right subclavian artery and did not fully extend to the intended position in the superior vena cava. The procedure was corrected the next day after an x-ray revealed the loop.[2]
Following the repositioning of the PICC line, Virgil was transferred emergently to the coronary care unit where he died several days later. The death certificate completed by Virgil's attending physician attributed Virgil's death to congestive heart *285 failure following an acute myocardial infarction stemming from his prolonged history of ischemic cardiomyopathy.
Following Virgil's death, Apostolico served ORMC with a Notice of Intent to Initiate Medical Negligence Litigation in accordance with section 766.106, Florida Statutes. Along with the Notice of Intent, Apostolico provided the affidavit of Miriam Headley, a registered nurse, to corroborate the medical negligence action, as required by section 766.203(2), Florida Statutes (2002). In her affidavit, Nurse Headley opined that ORMC and its staff failed to meet the standard of care in the insertion and care of the PICC line by the registered nurse and that the nurse designated to insert and care for the PICC line failed to measure the length of the catheter prior to repositioning it in its proper place within the superior vena cava. Finally, Nurse Headley concluded that within a reasonable degree of medical probability, Virgil died as a result of the deviations from the prevailing standards of care by ORMC and its staff.
Shortly thereafter, ORMC notified Apostolico that it believed Nurse Headley lacked the requisite qualifications to render an opinion relating to the insertion and care of Virgil's PICC line and its relationship to his death, and, as such, Apostolico had not conducted a "reasonable investigation" to pursue this claim. ORMC inquired during presuit discovery whether Apostolico intended to have this matter reviewed by a cardiologist in order to determine whether there were reasonable grounds to pursue the claim in satisfaction of the investigation requirements of section 766.203(2). Apostolico responded, "Objection, work product."
At the conclusion of the ninety-day investigatory period, ORMC rejected Apostolico's claim. In doing so, ORMC presented a corroborating expert affidavit from a board certified cardiologist, Stephen P. Glasser, M.D. In his affidavit, Dr. Glasser opined:
Based upon my review of the records, it is my opinion that the care and treatment rendered to Virgil Apostolico by the nursing staff and employees of Orlando Regional Healthcare System, Inc. d/b/a Orlando Regional Medical Center met the applicable standard of care throughout his hospitalization. In particular, it is my opinion that the nursing staff and employees met the applicable standard of care in maintaining the PICC line, and nothing involving the positioning of the PICC line caused or contributed to the decedent's death.
Apostolico then filed an action for wrongful death medical malpractice against ORMC. ORMC served its motion to dismiss, arguing that Apostolico failed to conduct a "reasonable investigation" of the claim because Apostolico's nursing expert was not qualified to render an opinion as to proximate cause. ORMC argued that because Apostolico failed to correct this deficiency with a review by a cardiologist within the statute of limitations despite adequate notice as to the deficiency of its nursing affidavit, her action should be dismissed with prejudice.
After a hearing, the trial court concluded that Apostolico failed to comply with the reasonable investigation requirements of section 766.201-.212, Florida Statutes (2002). Specifically, the trial court found that a nurse does not possess the medical training or expertise to determine cause of death, and, therefore, concluded that Apostolico failed to conduct a reasonable presuit investigation since she did not satisfy the causation prong of section 766.203(2). As a result, the trial court dismissed Apostolico's cause of action with prejudice pursuant to section 766.206(2), concluding that the deficiency could not be rectified within the then expired statute of limitations. This appeal followed.
*286 We review a trial court's disposition of a motion to dismiss de novo. As a result, we do not defer to the trial court on matters of law. See Fox v. Prof'l Wrecker Operators of Fla., Inc., 801 So.2d 175, 178 (Fla. 5th DCA 2001).
Florida courts are required to construe the Medical Malpractice Act "so as not to unduly restrict a Florida citizen's constitutionally guaranteed access to the courts, while at the same time carrying out the legislative policy of screening out frivolous lawsuits and defenses."[3]Kukral v. Mekras, 679 So.2d 278, 284 (Fla.1996); see Musculoskeletal Inst. Chartered v. Parham, 745 So.2d 946 (Fla.1999); Fort Walton Beach Med. Ctr., Inc. v. Dingler, 697 So.2d 575 (Fla. 1st DCA 1997). Presuit notice and screening requirements are "not intended to deny access to the courts on basis of technicalities." Dingler, 697 So.2d at 579 (citing Archer v. Maddux, 645 So.2d 544, 546 (Fla. 1st DCA 1994)). "Instead, the presuit notice and screening statute should be construed in a manner that favors access to courts." Id. (citing Patry v. Capps, 633 So.2d 9, 13 (Fla.1994)).
ORMC correctly observes that section 766.203(2), Florida Statutes (2002), provides that a claimant must establish both negligence and causation to support a claim for medical negligence. See also § 766.102(1), Fla. Stat. (2002) ("any action for recovery of damages based on the death or personal injury of any person in which it is alleged that such death or injury resulted from the negligence of a health care provider") (emphasis added). Further, both elements of negligence and causation must be corroborated by a qualified expert. § 766.203(2), Fla. Stat. (2002). Specifically, section 766.203(2) provides:
Prior to issuing notification of intent to initiate medical malpractice litigation pursuant to s. 766.106, the claimant shall conduct an investigation to ascertain that there are reasonable grounds to believe that:
(a) Any named defendant in the litigation was negligent in the care or treatment of the claimant; and
(b) Such negligence resulted in injury to the claimant.
Corroboration of reasonable grounds to initiate medical negligence litigation shall be provided by the claimant's submission of a verified written medical expert opinion from a medical expert as defined in s. 766.202(5), at the time the notice of intent to initiate litigation is mailed, which statement shall corroborate reasonable grounds to support the claim of medical negligence.
§ 766.203(2), Fla. Stat. (2002).
ORMC appears to concede that Nurse Headley was qualified to render an opinion *287 on the nursing staff's standard of care. However, ORMC argues that Nurse Headley was not qualified to render an expert opinion as to causation. ORMC argues that while physicians are specifically recognized to have the capability to diagnose and treat any mental or physical human ailments, nurses are limited to observing, assessing and evaluating physical or mental conditions, and then following the treatment plan authorized by physicians. ORMC concludes that because nurses cannot diagnose patients or prescribe treatment plans for their patients, they do not have the ability to determine a patient's cause of death, especially in a patient such as Virgil, who suffered from several serious cardiac and neurological conditions.
While section 766.203(2) directs the claimant to conduct an investigation to ascertain that there are reasonable grounds to believe that the defendant was negligent, it does not require the claimant to establish the defendant's negligence or prove its case during the presuit screening process. Maldonado v. EMSA Ltd. P'ship, 645 So.2d 86, 88 (Fla. 3d DCA 1994). Section 766.203(2) simply requires a corroborating opinion from a medical expert, as defined in section 766.202(5); it does not require a corroborating opinion from a medical expert as more narrowly defined by section 766.102(6). Id.
In Dingler, the first district court, analyzed section 766.202(5), in detail and commented:
[T]he legislature has clearly provided for two alternative means for qualifying a "medical expert." It begins by providing that to qualify under section 766.202(5) a "medical expert" must be "a person duly and regularly engaged in the practice of his profession who holds a health care professional degree from a university or college and has had professional training and experience." The statute then sets forth an alternative qualification by the use of the disjunctive article "or" followed by the noun "one," which can only, grammatically and logically in the context of section 766.102(5), be read in parallel construction with the noun "person." To satisfy this alternative qualification, the expert must be "possessed of special health care knowledge or skill about the subject upon which he is called to testify or provide an opinion."
697 So.2d at 579.
We conclude that a plain reading of section 766.202(5) indicates that a nurse or any other medical professional, with appropriate experience or training, may, under the proper facts, be qualified to provide corroboration about medical causation for presuit purposes.[4]See, e.g., Dingler *288 (recognizing that under section 766.202(5), a person may qualify as a medical expert for purposes of providing a presuit corroborating opinion if the person possess special health care knowledge or skill about the subject upon which he is called to testify or provide an opinion); Maldonado, 645 So.2d at 88 (finding that for presuit notice purposes, board-certified general surgeon was "medical expert" qualified to render opinion as to alleged negligence of emergency room physicians, and surgeon did not have to meet requirements of statute dealing with qualifications of expert witnesses in cases involving emergency medical services).
Admittedly, complex medical and factual issues are involved in a determination of proximate cause in a medical malpractice case. See generally Kent v. Pioneer Valley Hosp., 930 P.2d 904, 906 (Utah Ct.App.1997). However, based on Nurse Headley's extensive training and experience in critical care and cardiovascular services, she was a "medical expert" qualified to render opinion as to both the nursing staff's standard of care as well as the resulting death from the nursing staff's negligence. See § 464.003(3)(c), Fla. Stat. (2002) (defining the practice of "advanced or specialized nursing" as the practice of professional nursing[5] as well as the performance of advanced-level nursing by virtue of specialized education, training and experience; which includes nursing diagnosis and treatment,[6] and may also include medical diagnosis and treatment, prescription and operation, if approved by joint committee of Board of Nursing and Board of Medicine members).
Under the Medical Malpractice Act, a claimant must establish both negligence and causation to support a claim for medical negligence. See §§ 766.102, 766.203, Fla. Stat. (2002). The pertinent statutes clearly state that corroboration of reasonable grounds to initiate medical malpractice litigation may be provided by the claimant's submission of a verified medical expert opinion from a medical expert, defined under the relevant statute, as "a person" (not a physician), who holds a health care professional degree from a university or college (not a medical degree) or skill upon the subject which he is asked to provide an opinion. See §§ 766.203(2), 766.205(5), Fla. Stat. (2002).
Based on the statute's unambiguous and clear meaning, see In re McCollam, 612 So.2d 572, 573 (Fla.1993); Holly v. Auld, 450 So.2d 217, 219 (Fla.1984), we conclude that for presuit purposes, a nurse or any other medical professional, with appropriate experience or training, may qualify as a medical expert to corroborate that there were reasonable grounds to initiate a medical *289 malpractice action.[7] Because the trial court did not use the correct legal principles in determining that Nurse Headley was not a qualified medical expert, as defined by section 766.202(5), Florida Statutes (2002), the order dismissing Apostolico's wrongful death medical malpractice action must be reversed.
REVERSED AND REMANDED.
GRIFFIN and PLEUS, JJ., concur.
NOTES
[1] Chapter 766, Florida Statutes was revised, effective September 15, 2003. Ch.2003-416, § 87, Laws of Fla. However, the revisions apply only "to any medical incident for which a notice of intent to initiate litigation is mailed on or after the effective date of this act." Ch.2003-416, § 86, Laws of Fla. Thus, the revised statute does not apply here.
[2] Apparently, the PICC line was not corrected until 23 hours after it was initially inserted by Nurse Adams. An x-ray showed the PICC line tip in the right atrium. The PICC line nurse was present and immediately pulled the catheter back approximately 5 cm. Virgil's physician documented that Virgil's heart rate had increased to 120 beats per minute with resulting increase in myocardial workload.
[3] In interpreting the Medical Malpractice Act, we are guided by legislative intent. But in doing so, we begin with the proposition that the statutory medical malpractice scheme must be interpreted liberally so as not to unduly restrict a Florida citizen's constitutionally guaranteed access to the courts, while at the same time carrying out the legislative policy of screening out frivolous lawsuits and defenses. Kukral v. Mekras, 679 So.2d at 278, 284 (Fla.1996). The presuit notice of intent under chapter 766 is designed to give the potential defendant notice of the incident in order to allow investigation of the matter and promote presuit settlement of the claim. The expert corroborative opinion is intended to prevent the filing of baseless litigation. Shands Teaching Hosp. & Clinics, Inc. v. Barber, 638 So.2d 570, 572 (Fla. 1st DCA 1994). While it is true that the presuit requirements are conditions precedent to instituting a malpractice suit, the provisions of the statute are not intended to deny access to the courts on the basis of technicalities. Archer v. Maddux, 645 So.2d 544, 546 (Fla. 1st DCA 1994). Instead, the presuit notice and screening statute should be construed in a manner that favors access to courts. Patry v. Capps, 633 So.2d 9, 13 (Fla.1994).
[4] The 2002 version of section 766.102(6), Florida Statutes, does not delineate the requisite qualifications of the medical expert offering a presuit affidavit. Instead, the 2002 version of section 766.203(2) provides, in pertinent part, that "[c]orroboration of reasonable grounds to initiate medical negligence litigation shall be provided by the claimant's submission of a verified written medical expert opinion from a medical expert as defined in s. 766.202(5)...." Section 766.202(5), Florida Statutes (2002), provides that "[a]s used in ss. 766.201-766.212, the term `medical expert' means a person duly and regularly engaged in the practice of his profession who holds a health care professional degree from a university or college and has had special professional training and experience or one possessed of special health care knowledge or skill about the subject upon which he is called to testify or provide an opinion." These definitions lead us to conclude that section 766.202(5) provides a less stringent standard for qualification of experts in the medical malpractice presuit screening process than might be required of an expert to offer testimony at trial. See Faber v. Wrobel, 673 So.2d 871, 872-73 (Fla. 2d DCA 1995). This conclusion is buttressed by the legislative aim of preventing frivolous lawsuits while not unreasonably denying a claimant's access to court. See id.
[5] § 464.003(3)(a), Fla. Stat. (2002) (defining the practice of professional nursing as the performance of acts requiring substantial specialized knowledge, judgment, and nursing skill based upon applied principles of psychological, biological, physical, and social sciences, which include, but are not limited to the observation, assessment, nursing diagnosis, planning, intervention, and evaluation of care; health teaching and counseling of the ill, injured, or infirm; the administration of medications and treatments as prescribed or authorized by a duly licensed practitioner and the supervision and teaching of other personnel in the theory and performance of any of the above acts).
[6] § 464.003(3)(d) & (e), Fla. Stat. (2002) (defining "nursing diagnosis" as the observation and evaluation of physical or mental conditions, behaviors, signs, symptoms of illness, and reaction to treatments, and "nursing treatment" as a nursing regiment that provides for the care and comfort of individuals, the prevention of illness, and the education, restoration, and maintenance of health).
[7] It is parenthetically noted that ORMC's reliance on Correa v. Robertson, 693 So.2d 619 (Fla. 2d DCA 1997), is misplaced. In Correa, the second district court held that hospital administrator was not qualified as a "medical expert" for purposes of medical malpractice presuit notice. In rendering this opinion, the court appeared to be stating that only "health care providers" could be the affiants signing presuit affidavits. Specifically, the court stated that "health care providers" as contemplated under section 766.202(5), "includes `physicians licensed under chapter 458 ... nurses licensed under chapter 464,' but does not include a hospital administrator...." Id. at 621 (citing Weinstock v. Groth, 629 So.2d 835, 836-37 (Fla.1993) (emphasis added)).