# Supreme Court of Florida

_____

No. SC16-931
_____

**TUYUANA L. MORRIS, etc.,**
Petitioner,

vs.

**ORLANDO S. MUNIZ, M.D., et al.,**
Respondents.

September 6, 2018

PARIENTE, J.

Following the death of a twenty-year-old woman three days after giving birth to a stillborn child, the trial court dismissed the personal representative's wrongful death medical malpractice action, determining that her presuit medical expert was not "qualified" to provide a medical expert opinion under section 766.102, Florida Statutes (2011). The trial court also dismissed the action based on its finding that the personal representative failed to comply with the informal presuit discovery process for medical malpractice claims in violation of section 766.205, Florida Statutes (2011). Significantly, in dismissing under this basis, the

trial court made no finding that any perceived noncompliance with the discovery process resulted in prejudice to the Defendants.[1]

Reviewing both bases for dismissal for an abuse of discretion and without addressing the issue of prejudice, the First District Court of Appeal affirmed. *Morris v. Muniz*, 189 So. 3d 348, 351 (Fla. 1st DCA 2016). Other district courts of appeal have reviewed a trial court's dismissal of a medical malpractice action for failure to obtain a qualified presuit medical expert de novo. *See, e.g.*, *Edwards v. Sunrise Ophthalmology Asc, LLC*, 134 So. 3d 1056, 1057 (Fla. 4th DCA 2013); *Holden v. Bober*, 39 So. 3d 396, 400 (Fla. 2d DCA 2010); *Apostolico v. Orlando Reg'l Health Care Sys., Inc.*, 871 So. 2d 283, 286 (Fla. 5th DCA 2004).

The first conflict issue in this case requires us to determine the proper standard of review of a dismissal of a medical malpractice action based on the trial court's determination that the plaintiff's presuit medical expert was not qualified to provide a medical expert opinion. The second conflict issue requires us to consider whether a finding of prejudice must be made before the trial court can dismiss a

---

1. The Defendants in this case include Orlando S. Muniz, M.D., Marianna OB/GYN Associates, Inc., Jackson Hospital, Bay Hospital, Inc., d/b/a Gulf Coast Medical Center (GCMC), and Stephen G. Smith, M.D.

medical malpractice action as a sanction for a plaintiff's failure to comply with the informal presuit discovery process.[2]

To resolve these issues, we consider two guiding principles. First, the purpose of the medical malpractice presuit investigation is to "facilitate evaluation of the claim." § 766.205(1), Fla. Stat. (2011). Indeed, as we have explained, the presuit process was created to "facilitate the expedient, and preferably amicable, resolution of medical malpractice claims." *Williams v. Oken*, 62 So. 3d 1129, 1133 n.1 (Fla. 2011) (citation omitted); *see* § 766.201(2), Fla. Stat. (2011) ("It is the intent of the Legislature to provide a plan for prompt resolution of medical negligence claims."). Second, this Court must construe the medical malpractice presuit screening requirements "in a manner that favors access to courts." *Patry v. Capps*, 633 So. 2d 9, 13 (Fla. 1994) (citing *Weinstock v. Groth*, 629 So. 2d 835, 838 (Fla. 1993)).

For the reasons that follow, we hold that, where the facts regarding the presuit expert's qualifications are unrefuted, the proper standard of review of a trial court's dismissal of a medical malpractice action based on its determination that the plaintiff's presuit expert witness was not qualified is de novo. Additionally, we hold that, before a medical malpractice action can be dismissed based on a trial

---

2. We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const.

court's finding that the plaintiff or plaintiff's counsel failed to comply with the informal presuit discovery process for medical malpractice actions, the trial court must find that such noncompliance prejudiced the defendant. This holding is consistent with our precedent, which makes clear that before an action can be dismissed for a plaintiff's failure to comply with discovery, the trial court must find that the plaintiff's noncompliance prejudiced the defendant. *See, e.g.*, *Ham v. Dunmire*, 891 So. 2d 492, 499 (Fla. 2004); *Kukral v. Mekras*, 679 So. 2d 278, 279 (Fla. 1996). On appeal, the reviewing court should determine whether there was, in fact, a discovery violation and whether that violation prejudiced the defendant. To hold otherwise would not only deprive plaintiffs of their constitutional right to access the courts but would also frustrate the Legislature's intent in enacting the medical malpractice statutory scheme.

In this case, because the record demonstrates that Morris's presuit expert was qualified, and because the record does not establish that the Defendants suffered any prejudice for the alleged noncompliance with discovery, we conclude that the trial court erred in dismissing Morris's action. Accordingly, we quash the First District's decision and remand with instructions to reinstate Morris's complaint.

# FACTUAL BACKGROUND

This case arises out of a medical malpractice wrongful death action brought by Tuyuana L. Morris, as Personal Representative of the Estate of Shunteria S. McIntyre, the decedent.  As this case was dismissed before the opportunity for formal discovery, the facts set forth below, regarding the events that led to the decedent's death, are taken from the complaint and the affidavit of Morris's presuit expert.

On October 22, 2008, the decedent, who was pregnant, was accepted as a patient at Marianna OB/GYN Associates, Inc., for prenatal (obstetric) care by Dr. Orlando S. Muniz.  Over the next three months, the decedent visited Dr. Muniz and Jackson Hospital numerous times with complaints of nausea and vomiting.  By December 17, 2008, the decedent had lost twenty-six pounds since her October 22 visit; by December 29, the decedent had lost a total of thirty-six pounds.

On January 18, 2009, the decedent went to GCMC, complaining of, among other things, mouth sores and blisters, vomiting, and dizziness.  She could not eat, walk, or use the restroom, was suffering hallucinations, and was unable to detect movement of her unborn baby.  On January 21, the decedent delivered a stillborn baby at GCMC.  After delivery, the decedent underwent a surgical procedure—dilation and curettage.  Hours after the surgery, the decedent was discharged from

GCMC by Dr. Stephen G. Smith and advised to return for a follow-up appointment in three weeks.

Three days later, on January 24, 2009, the decedent collapsed at home. She was transported to a nearby hospital where she died. An autopsy revealed that the decedent's cause of death was "Klebsiella Pneumoniae Septicemia along with contributing causes [of] recent Intrauterine fetal demise and Severe Acute Diarrhea."

Prior to filing the complaint, Morris provided the Defendants with a notice of intent to initiate medical malpractice litigation and a verified written medical expert opinion, as required by section 766.203(2), Florida Statutes (2011). The expert opinion was provided by Dr. Margaret M. Thompson, who attested in a sworn affidavit that she was a board-certified obstetrician and gynecologist. Dr. Thompson first obtained board certification in 1984 and was thereafter recertified in 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, and 2009. Over the course of her thirty-year career, she delivered more than 14,000 babies, had been "Chief of the OB-GYN department at a large medical center, Chief of Staff at a small women's specialty hospital, and member of hospital-wide peer review committees." According to her affidavit, Dr. Thompson received her Juris Doctorate in 2007 and her Master's in Public Affairs in 2008. She also swore that she "was engaged in full-time patient care until March 2008." Although Dr.

Thompson stated in her affidavit that she was now retired due to arthritis in her hands, she was currently licensed to practice medicine in Texas.

Upon receiving Morris's notice of intent to initiate medical malpractice litigation and Dr. Thompson's affidavit, the Defendants requested additional information related to Dr. Thompson's qualifications, including a detailed employment history for Dr. Thompson from January 2001 through the present, the number of hours per week Dr. Thompson devoted to the active clinical practice of the same or similar specialty field, and the number of babies Dr. Thompson delivered each year from 2006 through 2009. Morris responded to the Defendants by stating, "See Affidavit of Dr. Margaret Thompson; please also see medical records as provided by Jackson Hospital as to treatment provided or the lack thereof."[3]

Thereafter, Morris filed this action, alleging that the Defendants were negligent in, among other things, failing to recognize the severity of the decedent's complaints and failing to correctly diagnose and treat the decedent's condition. The Defendants moved to dismiss, arguing first, that Dr. Thompson was not a qualified expert under section 766.102(5)(a)2, Florida Statutes (2011)—which

---

3. GCMC asserts in its answer brief to this Court that Morris never responded to its request for additional information. Answer Br. of Resp't GCMC at 5. The record supports GCMC's assertion.

requires that an expert in a medical malpractice case devote professional time during the three years immediately preceding the date of the occurrence that is the basis for the action—because she "was enrolled in law school and graduate school during the three years prior to the time of the subject incident." GCMC and Jackson Hospital further argued that Dr. Thompson was not qualified under section 766.102(6), Florida Statutes (2011)—which requires that an expert in a medical malpractice case concerning the standard of care of medical support staff such as nurses, nurse practitioners, and physician assistants have knowledge of the standard of care applicable to such medical support staff. Thus, because Morris failed to provide corroboration of reasonable grounds to initiate medical malpractice litigation in a verified written medical expert opinion from a *qualified* medical expert, the Defendants argued, dismissal was warranted under section 766.206(2), Florida Statutes (2011).

As a second basis for dismissal, the Defendants argued that Morris failed to provide them with the additional information they requested during the informal presuit discovery process, as required by statute. Thus, the Defendants argued, Morris did not act in good faith during the statutory presuit period and dismissal was warranted under section 766.205(2), Florida Statutes (2011).

The trial court agreed with the Defendants' skepticism, finding that the "general qualifications" in Dr. Thompson's affidavit did "not state specifically the

level of practice that she engaged in during the three years immediately preceding the date of the occurrence . . . alleged in [Morris's] complaint." The trial court also agreed with the Defendants that Morris refused to provide the additional information regarding Dr. Thompson's qualifications sought by the Defendants. Relying on this Court's opinion in *Williams*, 62 So. 3d 1129, the trial court permitted the Defendants to engage in limited discovery directed solely to Dr. Thompson's qualifications.[4]

In compliance with the trial court's order, the parties scheduled the deposition of Dr. Thompson. Prior to the deposition, the Defendants requested certain documents, including copies of "any and all publications" authored by Dr. Thompson and copies of her law school and graduate school transcripts. Morris objected to the Defendants' request for production, arguing that the documents requested "were beyond the scope" of the order, were not in Dr. Thompson's possession, and related to information that had already been produced.

---

4. Initially, the trial court also ordered Morris to pay "all of Dr. Thompson's fees and the attorneys' fees and taxable costs incurred by the Defendants in engaging in this discovery process" as a sanction for Morris's failure to provide the requested information during the presuit process. However, upon Morris's motion for rehearing, the trial court issued an order stating that "[u]pon further consideration this Court concludes that an award of Defendants' attorney's fees and taxable costs for conducting that discovery would be premature." Accordingly, the trial court "reserve[d] ruling" on that issue until it determined whether Dr. Thompson was a qualified corroborating expert.

At the deposition, Dr. Thompson testified that from 2006 through her retirement from clinical practice in March 2008, she worked more than fifty hours per week as an obstetrician-gynecologist (OB-GYN) in her office and at a hospital. However, the Defendants continued questioning Dr. Thompson as to how she could attend law school while continuing to engage in full-time patient care. Dr. Thompson explained that if she "were working a hundred hours a week and 50 were devoted to [her] practice, that still le[ft] [her] 50 hours for law school." Additionally, prior to starting law school, Dr. Thompson met with the dean to inform him that she was going to continue practicing medicine. Although the law school did not have any special accommodations for part-time or alternative students, the dean allowed Dr. Thompson to "choose the section that the hours of classes would most accommodate [her] practice schedule." Dr. Thompson explained:

> After the first year, then I had a lot more flexibility. For the first year, I picked the section that classed, as I recall, from 8:30 to noon Monday through Thursday. On some mornings I would have a surgery or C-section prior to going to class at 7:00 or 7:30 in the morning. I went directly from my classes at 12:00 and started my practice in the office at 12:30 or 1:00, and worked till about 7:00 in the evening. I went home, I studied for law school if I wasn't on call or did not have patients in labor. If I did, I stayed at the hospital and always had my books ready to study there if I needed to be at the hospital. On weekends—on Friday, when I did not have classes, I usually did my surgeries and my deliveries that might be elective, like inductions. On Saturdays and Sundays I took call and studied. . . . I tell you, after the first year when I had more flexibility, I selected classes that, when possible, met for longer periods, two days a week,

like Tuesdays and Thursdays. So I grouped my classes together to minimize the time that I had to be away from the office and the hospital. And I took an extra semester to graduate. . . . And that's how I did it.

Following the deposition and an evidentiary hearing, the trial court granted the Defendants' motion to dismiss. Noting its previous determination that Dr. Thompson's affidavit did "not state specifically the level of practice she engaged in during the three years immediately preceding the date of occurrence," the trial court wrote that it "once again querie[d] the feasibility" of Dr. Thompson's statement that she was engaged in full-time patient care until March 2008.

Moreover, the trial court found that the Defendants' "reasonable inquiries" as to Dr. Thompson's qualifications "remain unanswered due to [Morris's] counsel [sic] restrictions to the limited discovery process." Referencing Morris's counsel's repeated objections during Dr. Thompson's deposition and direction to Dr. Thompson to not answer certain questions, the trial court found that the Defendants were "thwarted" from learning certain information, such as whether Dr. Thompson was aware of the American Bar Association (ABA) accreditation rules restricting students to no more than twenty hours of work per week while attending law school and whether she had applied for disability "during the same period of time preceding this suit" due to her arthritis. Further, the court found that the actions of Morris's counsel "were purposeful and designed to deprive the Defendants' [sic] of the ability to meaningfully participate in pre-suit discovery of the medical

negligence claims against them, and as such was not in good faith. Twenty three months after the initial hearing," the trial court wrote, "the record establishes scant additional information about the specific qualifications of Dr. Thompson, nor her ability to devote professional time in this arena for years preceding the occurrence which is the gravamen of this suit." Ultimately, the trial court concluded:

> This Court is well aware the salient statutory provisions are not intended to deny parties' access to Courts on the basis of technicalities. However, the actions as demonstrated in this cause rise above mere technicalities. [Morris] has not complied with the statutory pre suit requirements, or allowed reasonable discovery into their expert's devoted professional time 3 to 5 years immediately preceding the occurrence in this cause. As the applicable statute of limitations has long since expired, and [Morris] cannot remedy this issue with another expert, dismissal is a proper remedy pursuant to [sections] 766.205(2) and 766.206(2).

Morris appealed to the First District Court of Appeal, which, in a two-to-one decision, concluded that the trial court "did not abuse its discretion" and affirmed. *See Morris*, 189 So. 3d at 351. The majority reasoned:

> The Legislature has made it clear that the special qualifications required for presuit medical experts are essential to the Chapter 766 presuit investigation process. Likewise, courts have consistently noted the significance of the presuit expert requirements in determining a claim's legitimacy. Here, the record contains ample evidence to support the trial court's conclusions that [Morris] failed to offer sufficient proof of her proffered expert's statutory qualifications, and that [Morris's] lack of cooperation with [the Defendants'] attempts to verify the expert's qualifications merited dismissal under sections 766.205(2) and 766.206(2), Florida Statutes.

*Id.* at 350-51 (footnote omitted) (citations omitted).

Judge Swanson dissented with opinion, arguing:

[Morris] complied with the statutory presuit requirements by obtaining written corroboration from a qualified medical expert, Dr. Margaret Thompson. Because Dr. Thompson's affidavit clearly established her qualifications, that should have been the end of the matter. Instead, [the Defendants] filed a motion to dismiss [Morris's] complaint and used court-ordered limited discovery to go on a fishing expedition in an attempt to impeach Dr. Thompson's qualifications. After [Morris's] counsel refused to cooperate in this endeavor, the trial court dismissed [her] wrongful death action, depriving [Morris] of her constitutionally guaranteed access to the courts.

*Id.* at 351 (Swanson, J., dissenting). Judge Swanson stated that "Dr. Thompson's affidavit on its face clearly established that she met all of the statutory requirements," *id.* at 352, explaining:

Specifically, her affidavit and curriculum vitae detailed her education, experience, and professional awards and plainly demonstrated that she was a board-certified obstetrician/gynecologist (OB/GYN) for thirty years and had been engaged in full-time patient care prior to her retirement in March 2008, nine months before the decedent's death. Moreover, they demonstrated that she had served in several roles requiring her to supervise OB/GYN nurses and other medical staff at a hospital and to be familiar with the relevant standards of care. Despite this, the trial court allowed [the Defendants] to depose Dr. Thompson regarding her qualifications. During her deposition, Dr. Thompson stated that she worked more than fifty hours per week as an OB/GYN in 2006 through March 2008 and explained how she managed to attend both graduate and law school during the same period. Although the trial court questioned the "feasibility" of Dr. Thompson's statement that she was engaged in full-time patient care while pursuing her master's and law degrees, the trial court was not permitted to make credibility determinations concerning an otherwise unrebutted and facially sufficient affidavit. On a motion to dismiss challenging a plaintiff's compliance with the statutory presuit requirements in a medical malpractice action, this court applies the de novo standard of review and must consider all factual allegations in a

- 13 -

light most favorable to the plaintiff.  Because the trial court did not apply the correct principles in determining that Dr. Thompson was not a qualified medical expert, I would reverse the trial court's order dismissing [Morris's] wrongful death action.

*Id.* at 352-53 (citations omitted).  This review followed.

## ANALYSIS

The first conflict issue in this case requires us to determine the proper standard of review of a dismissal of a medical malpractice action based on the trial court's determination that the plaintiff's presuit medical expert is not qualified to provide a medical expert opinion.  The second conflict issue requires us to revisit whether a finding of prejudice must be made before the trial court can dismiss a medical malpractice action as a sanction for a plaintiff's failure to comply with the informal presuit discovery process.

Our analysis begins with Florida's medical malpractice statutory scheme codified in chapter 766, Florida Statutes (2011), which requires that prospective medical malpractice plaintiffs obtain the opinion of a medical expert to corroborate the claim of medical malpractice before filing suit.  From there, we turn to the trial court's first basis for dismissal under section 766.206(2), which states that a medical malpractice claim shall be dismissed where the prospective medical malpractice plaintiff does not comply "with the reasonable investigation requirements" of chapter 766, including obtaining "a verified medical expert opinion by an expert witness" as defined by statute.  § 766.206(2), Fla. Stat.

- 14 -

(2011). We address the conflict between the First District's application of an abuse of discretion standard of review to dismissal on this basis and the application of a de novo standard by several other district courts. *See, e.g.*, *Edwards*, 134 So. 3d at 1057; *Holden*, 39 So. 3d at 400; *Apostolico*, 871 So. 2d at 286. After resolving the conflict, we then address whether the presuit expert in this case was qualified under the statute. We then turn to the trial court's second basis for dismissal under section 766.205(2), Florida Statutes (2011), which states that, in a medical malpractice action, a party's failure to provide to the other party reasonable access to information in order to facilitate evaluation of the claim without formal discovery "shall be grounds for dismissal." § 766.205(2), Fla. Stat. (2011); *see id.* § 766.205(1).

## I. Chapter 766

Florida's medical malpractice statutory scheme, codified in chapter 766, Florida Statutes, contains an elaborate presuit process for prospective medical malpractice plaintiffs, including a presuit investigation component. *See id.* § 766.201(2). As we have explained, the presuit process was created to "facilitate the expedient, and preferably amicable, resolution of medical malpractice claims." *Williams*, 62 So. 3d at 1133 n.1 (citation omitted); *see* § 766.201(2), Fla. Stat. (2011) ("It is the intent of the Legislature to provide a plan for prompt resolution of medical negligence claims."). The Legislature's intent notwithstanding, we have

- 15 -

stated that the presuit process "restrict[s] plaintiffs' ability to bring medical malpractice claims." *Dockswell v. Bethesda Mem'l Hosp., Inc.*, 210 So. 3d 1201, 1205 (Fla. 2017). Therefore, the requirements of the presuit process must be "interpreted liberally so as not to unduly restrict a Florida citizen's constitutionally guaranteed access to the courts." *Kukral*, 679 So. 2d at 284.

Under section 766.203(2), prior to filing a medical malpractice action, a prospective plaintiff "shall conduct an investigation to ascertain that there are reasonable grounds to believe" that the defendant was negligent and that such negligence caused the prospective plaintiff's injury. § 766.203(2), Fla. Stat. (2011). "Corroboration of reasonable grounds to initiate medical negligence litigation shall be provided by the [prospective plaintiff's] submission of a verified written medical expert opinion from a medical expert as defined in s. 766.202(6)." *Id.*

Section 766.202(6), Florida Statutes (2011), which governs the qualifications of presuit expert witnesses, defines a medical expert as:

> [A] person duly and regularly engaged in the practice of his or her profession who holds a health care professional degree from a university or college and who meets the requirements of an expert witness as set forth in s. 766.102.

§ 766.202(6), Fla. Stat. (2011). This section does not define "duly and regularly engaged." As the language above indicates, section 766.202(6) refers to and incorporates the requirements of section 766.102, Florida Statutes (2011), which

- 16 -

governs the qualifications of expert witnesses in all medical malpractice cases.

Section 766.102(5) states in pertinent part:

> (5) A person may not give expert testimony concerning the prevailing professional standard of care unless the person is a health care provider who holds an active and valid license and conducts a complete review of the pertinent medical records and meets the following criteria:
>
> (a) If the health care provider against whom or on whose behalf the testimony is offered is a specialist, the expert witness must:
> 1. Specialize in the same specialty as the health care provider against whom or on whose behalf the testimony is offered; . . . and
> 2. Have devoted professional time during the 3 years immediately preceding the date of the occurrence that is the basis for the action to:
> a. The active clinical practice of, or consulting with respect to, the same or similar specialty . . . ;
> b. Instruction of students in an accredited health professional school or accredited residency or clinical research program in the same specialty; or
> c. A clinical research program that is affiliated with an accredited health professional school or accredited residency or clinical research program in the same specialty.

*Id.* § 766.102(5)(a).  Section 766.102(5)(a)2. does not define "professional time."[5]

---

5.  Sections 766.202 and 766.102 were amended in 2003.  Ch. 2003-416, § 48, Laws of Fla.  Prior to 2003, a medical expert was defined as one who was "duly and regularly engaged in the practice of his or her profession who holds a health care professional degree from a university or college and has had special professional training and experience or one possessed of special health care knowledge or skill about the subject upon which he or she is called to testify or provide an opinion."  § 766.202(5), Fla. Stat. (2002).  There was no cross-reference to section 766.102.  *Id.*  In fact, prior to 2003, the language in what is now section 766.102(5) and (6) did not exist; those, too, were added by the Legislature in 2003.

Although chapter 766 does not define "professional time" or "duly and regularly engaged," we have explained the purpose of the presuit corroborating expert opinion as follows:

> The expert opinion to be supplied is not one which delineates *how* the defendants were negligent. Section 766.104 refers to a written medical opinion "that there appears to be evidence of medical negligence." Section 766.203(2) provides that the medical expert opinion is for "corroboration of reasonable grounds to initiate medical negligence litigation." And [section] 766.205(1) specifically provides that the medical opinion need only corroborate that "there exists reasonable grounds for a claim of negligent injury." Obviously, the corroborative medical opinion adds nothing to the Plaintiffs' notice of their claim. It merely assures the Defendants, and the court, that a medical expert has determined that there is justification for the Plaintiffs' claim, i.e., *that it is not a frivolous medical malpractice claim*.

*Kukral*, 679 So. 2d at 282 (quoting *Stebilla v. Mussallem*, 595 So. 2d 136, 139 (Fla. 5th DCA 1992)). Stated another way, "[r]equiring a written expert opinion as

---

An analysis of the bill that amended sections 766.202 and 766.102 suggests that the changes were made in an attempt to eliminate the occurrence of specialists testifying against nonspecialists and general practitioners. The analysis observes:

> A great deal of litigation has occurred as a result of attempting to interpret and apply the provisions of s. 766.102(2), F.S. The terms "medical specialty," "specialty," "specialist," and "discipline or school of practice" are not defined in the statutes. As a result, it is not uncommon for trial court judges to allow specialists to testify against non-specialists and general practitioners.

Fla. S. Comm. on Health, Aging, and Long-Term Care, CS for SB 2-D (2003), Staff Analysis & Economic Impact Statement 18 (Aug. 12, 2003) (available at Fla. Dep't of State, Fla. State Archives, Tallahassee, Fla.).

part of the presuit investigation" simply "assures the defendant that the claim was preceded by a reasonable investigation." *Largie v. Gregorian*, 913 So. 2d 635, 639 (Fla. 3d DCA 2005).

Consistent with the purpose of a reasonable investigation, the purpose of requiring an expert witness at the presuit stage is to assure that the corroborating opinion has been verified by a medical expert.[6]  There is no indication that the Legislature, in enacting this presuit process originally, or through its 2003 amendments to sections 766.102 and 766.202, intended to make the qualifications for a presuit expert more stringent than an expert testifying at trial.

Despite this lack of legislative intent, the dissent asserts that section 766.202(6) does impose an additional requirement on the presuit expert, requiring that the presuit expert be duly and regularly engaged "*at the time the written medical expert opinion is offered*."  Dissenting op. at 42 (emphasis added).  In advancing this interpretation, the dissent acknowledges that it has not been argued by the parties, nor was it considered by the trial court.  *See* dissenting op. at 46.

_____

6. Medical malpractice is the only area of law where the Legislature has imposed strict requirements on the testimony of experts.  All other areas are governed by section 90.702, Florida Statutes (2018), entitled "Testimony by experts."  Thus, in creating its own requirements for expert testimony, the Legislature has severely limited the ability of trial judges to determine whether an expert is qualified.  *See Simmons v. State*, 934 So. 2d 1100, 1117 (Fla. 2006) ("A trial judge has the discretion to determine if a witness's qualifications render him or her an expert, and this determination will not be overturned absent clear error.").

Nevertheless, the dissent asserts that the statutory language "plainly" requires this construction.

We emphasize, however, as the dissent acknowledges, that Florida courts have expressly rejected this construction. *See Baptist Med. Ctr. of Beaches, Inc. v. Rhodin*, 40 So. 3d 112, 118 (Fla. 2010); *Fort Walton Beach Med. Ctr., Inc. v. Dingler*, 697 So. 2d 575 (Fla. 1st DCA 1997). Indeed, in 1997, the First District expressly rejected the argument that the "duly and regularly engaged" language in section 766.202 means "at the time the corroborating opinion and affidavit are signed." *Dingler*, 697 So. 2d at 580. The First District explained that it was "logical that the legislature intended the more specific time period in" section 766.102 "to define when the proposed expert must have been 'engaged in the practice' " under section 766.202. *Id.* That reasoning was then appropriately adopted in *Rhodin* to reject the defendant's argument that the plaintiff's presuit expert was not qualified. 40 So. 3d at 118.

Additionally, while the dissent argues that the 2003 amendments to section 766.202(6) support its interpretation, the "duly and regularly engaged" language has remained unchanged since its first appearance in the statute in 1988. *See* § 766.202, Fla. Stat. (Supp. 1988). This is especially important because the Legislature " 'is presumed to know the judicial constructions of a law when enacting a new version of that law' and "the legislature is presumed to have

- 20 -

adopted prior judicial constructions of a law unless a contrary intention is expressed in the new version.' " *Jones v. ETS of New Orleans*, Inc., 793 So. 2d 912, 917 (Fla. 2001) (quoting *City of Hollywood v. Lombardi*, 770 So. 2d 1196, 1202 (Fla. 2000)). Thus, in this case, the Legislature is presumed to be aware of the First District's interpretation of section 766.202 in 1997 and made no changes to it.

Further, nowhere in section 766.202(6) does it state that the expert must be duly and regularly engaged at the time the opinion is offered, when the role of the medical expert is to provide an opinion regarding the prevailing professional standard of care, or the professional standard of care existing at the time of the occurrence that is the basis for action. *See* §§ 766.102(1); 766.203(2). We cannot agree with a construction that not only runs counter to the purpose of the presuit process, which is to facilitate the resolution of medical malpractice claims, but also has the effect of infringing on the constitutional right to access the courts.

Finally, with respect to the ability of a medical expert to provide an opinion on the negligence of nurses and other support staff, a separate subsection in section 766.102 covers expert testimony regarding the standard of care applicable to nurses and other medical support staff. *See* § 766.102(6). Section 766.102(6) states that a person "may give expert testimony in a medical negligence action with respect to the standard of care of such medical support staff" if he or she is

qualified under section 766.102(5) and has "knowledge of the applicable standard of care for nurses, nurse practitioners . . . or other medical support staff." *Id.* § 766.102(6). This section does not specify how a person must demonstrate his or her knowledge of the applicable standard of care for medical support staff. *See id.*

Having set forth the relevant statutory provisions, we now turn to address the first basis for dismissal in this case.

## II. Dismissal for Failure to Obtain a "Qualified" Expert Witness

Under section 766.206(2), if the court finds that the plaintiff's notice of intent to initiate medical malpractice litigation "does not comply with the reasonable investigation requirements of ss. 766.201-766.212, including a review of the claim and a verified written medical expert opinion by an expert witness as defined in s. 766.202 . . . the court shall dismiss the claim." § 766.206(2), Fla. Stat. (2011). This provision, like all provisions governing the presuit screening process for medical malpractice claims, must be construed "in a manner that favors access to courts." *Patry*, 633 So. 2d at 13 (citing *Weinstock*, 629 So. 2d at 838).

## A. The Conflict

Morris argues that the proper standard of review of the dismissal of a medical malpractice action based on the trial court's determination that the plaintiff's presuit medical expert is not qualified is de novo, as other district courts have concluded, because the determination as to whether a presuit expert meets the

statutory qualifications is a legal one.  *See, e.g.*, *Edwards*, 134 So. 3d at 1057;

*Holden*, 39 So. 3d at 400; *Apostolico*, 871 So. 2d at 286.  Rejecting the First

District's application of an abuse of discretion standard, the Defendants counter

that, because the trial court held an evidentiary hearing on the issue, the correct

standard of appellate review is whether the trial court's ruling is supported by

competent, substantial evidence.  For the reasons that follow, we conclude that,

where the facts regarding a presuit expert's qualifications are unrefuted, the proper

standard of appellate review of a trial court's dismissal of a medical malpractice

action based on its conclusion that the plaintiff's presuit medical expert is not

qualified is de novo.  Even if the proper review standard were competent,

substantial evidence, we would conclude that nothing in the record supports the

trial court's conclusion that Morris's expert was not qualified.

In *Holden*, the plaintiff's medical malpractice action was dismissed after the

trial court determined that the plaintiff failed to corroborate that reasonable

grounds existed for the claim because his presuit medical expert's affidavit did not

establish that he was qualified to provide a medical expert opinion.  39 So. 3d at

398-99.  The Second District Court of Appeal first correctly observed that "the

medical malpractice statutory scheme must be interpreted liberally so as not to

unduly restrict a Florida citizen's constitutionally guaranteed access to the courts."

*Id.* at 400 (quoting *Kukral*, 679 So. 2d at 284).  The Second District went on to

determine that "[i]n order to adhere to the policy enunciated behind the presuit notice requirements," courts "must review the sufficiency of [the plaintiff's expert's] qualifications and his corroborating affidavit to determine if it complies with the statutory requirements of chapter 766." *Id.* Finally, the Second District stated that because the case involved "the trial court's disposition of a motion to dismiss," the standard of review was de novo. *Id.*; *see also Apostolico*, 871 So. 2d at 286 ("We review a trial court's disposition of a motion to dismiss de novo.").

We agree with the Second District's analysis. Determining whether a presuit expert witness is qualified under the statute involves reviewing the expert's stated qualifications and comparing those with what is required under the statute. The trial court is in no better position than the appellate court to conduct this analysis. This conclusion is also consistent with the well-established principle that pure questions of law are reviewed de novo. *See Bosem v. Musa Holdings, Inc.*, 46 So. 3d 42, 44 (Fla. 2010).

We are unpersuaded by the Defendants' position that merely because the trial court holds an evidentiary hearing on the issue of the presuit expert's qualifications, the appellate standard of review can only be competent, substantial evidence. As the Second District explained in *Oliveros v. Adventist Health Systems/Sunbelt, Inc.*, 45 So. 3d 873 (Fla. 2d DCA 2010), where "the facts concerning [the expert's] background and experience are unrefuted, the question of

- 24 -

his [or her] qualifications as an expert turns on the application of the relevant statutes, which is an issue of law," reviewed de novo. *Id.* at 876; *see also Aills v. Boemi*, 29 So. 3d 1105, 1108 (Fla. 2010) (stating that questions of law "arising from undisputed facts" are reviewed de novo); *Kirton v. Fields*, 997 So. 2d 349, 352 (Fla. 2008). Stated another way, where the facts regarding the presuit expert's qualifications are unrefuted, the trial court has not resolved any factual disputes that are entitled to deference on appeal. We thus hold that, where the facts regarding the presuit expert's qualifications are unrefuted, the proper standard of appellate review of the dismissal of a medical malpractice action based on the trial court's conclusion that the plaintiff's presuit medical expert is not qualified is de novo.

We recognize that there may be cases where the trial court must reconcile factual disputes regarding a presuit expert witness's qualifications. Indeed, section 766.203(4), Florida Statutes (2011), states that the medical expert opinion corroborating a prospective plaintiff's claim of medical malpractice is "subject to discovery." *Id.* That section goes on to state that the expert's opinion "shall specify whether any previous opinion by the same medical expert has been disqualified and if so the name of the court and the case number in which the ruling was issued." *Id.* Thus, using this provision as an example, there could be a case where the presuit expert swears that he or she has not been previously

- 25 -

disqualified and the defendant presents evidence to dispute that. The trial court's finding on that disputed fact would be entitled to deference on appeal.

However, we reiterate that a trial court's ruling on whether an expert's stated qualifications satisfy the requirements of the statute is reviewed de novo, as such an inquiry requires simply construing the statute's requirements and determining whether the expert's qualifications align, which the appellate court is on equal footing with the trial court to do. We now turn to this case.

## B. This Case

In this case, Morris's expert, Dr. Thompson, stated in her sworn affidavit that she was a board-certified obstetrician, who, over her thirty-year career had been chief of the OB-GYN department at a large medical center, chief of staff at a small women's specialty hospital, and member of hospital-wide peer review committees. Her affidavit also stated that she was engaged in full-time patient care until March 2008, which was several months before the incidents alleged in the complaint began, she was currently licensed to practice medicine, and she was recertified as a board-certified obstetrician in 2007 and 2009.

The Defendants presented no evidence to suggest that Dr. Thompson's claims were false. Instead, they merely challenged the sufficiency of Dr. Thompson's stated qualifications and her ability to devote "professional time to" or be "regularly engaged" in the practice of medicine while in law school.

Questioning the veracity of an expert's sworn statements is not the same as presenting evidence that suggests that the claims in the affidavit are false. Nevertheless, the trial court found that Dr. Thompson was not a qualified expert under section 766.102(5)(a)2. or section 766.102(6).[7] We conclude that this was error, as Dr. Thompson's affidavit clearly established that she met the statutory requirements, and the Defendants presented no evidence to refute her sworn statements.

In concluding that Dr. Thompson was not a qualified expert, the trial court and the dissent read far more into the statutes than what they clearly and unambiguously require. The trial court found that Dr. Thompson failed to establish that she was qualified because her affidavit contained only "general qualifications" and did not "state specifically" the level of practice she was engaged in during the relevant three-year period, but the statutes do not demand

---

7. The trial court also found that Dr. Thompson was not qualified under section 766.102(9), which states that in an action for damages involving a claim against a physician licensed under certain chapters "providing emergency medical services in a hospital emergency department, the court shall admit expert medical testimony only from physicians . . . who have had substantial professional experience within the preceding 5 years while assigned to provide emergency medical services in a hospital emergency department." However, Morris has made clear that Dr. Thompson never intended to assert that she was qualified to give such testimony, stating in her response to the Defendants' motion to dismiss in the trial court that she "did not bring a claim against ER physicians regarding any ER physicians' treatment and care. Thus such argument is moot." Morris continues to hold that position in this Court.

such specificity.  As this Court has explained, we are "not at liberty to construe" terms "so as to deprive plaintiffs of their causes of action."  *Silva v. Sw. Fla. Blood Bank*, 601 So. 2d 1184, 1189 (Fla. 1992); *see Weinstock*, 629 So. 2d at 838. Because Dr. Thompson's affidavit clearly complies with the statutory requirements, the trial court erred in finding that Dr. Thompson was not qualified. §§ 766.202(6); 766.102(5)(a)2., Fla. Stat. (2011).

As to the trial court's finding that Dr. Thompson's affidavit failed to establish that she was qualified to provide a medical expert opinion regarding the standard of care for medical support staff under section 766.102(6), we conclude that the trial court again misconstrued the statute's requirements.  As stated previously, Dr. Thompson swore in her affidavit that she was "Chief of the OB-GYN department at a large medical center, Chief of Staff at a small women's specialty hospital, and member of hospital-wide peer review committees."  We fail to understand how Dr. Thompson could have overseen, managed, and reviewed medical support staff in those roles without knowledge of the standard of care applicable to that support staff.

Even if Dr. Thompson's affidavit was insufficient to demonstrate her qualifications under the statutes, Dr. Thompson clearly demonstrated at her deposition that she was qualified, as she testified that she employed a nurse practitioner and was familiar with Austin Medical Center's policies and procedures

for nurses, having used them on a regular basis and "probably contributed to writing some of them." Additionally, Dr. Thompson unequivocally testified that she was qualified to render an opinion as to the standard of care applicable to medical support staff treating a patient that was in her specialty. There is simply no evidence in the record to refute Dr. Thompson's sworn statements. Thus, because Dr. Thompson clearly met the statutory requirements, Morris's medical malpractice action should not have been dismissed under section 766.206(2).

## C. Conclusion as to the Expert's Qualifications

At the time the presuit medical expert in this case executed her affidavit corroborating Morris's claims of medical malpractice, she had enjoyed a thirty-year career as an OB-GYN, graduating from medical school in 1978 and becoming board-certified in obstetrics and gynecology in 1984. Her long career included serving as chief of the OB-GYN department at a large medical center and chief of staff at a small women's hospital. In short, Dr. Thompson is just the type of expert that the Legislature would consider is qualified. Accordingly, because Dr. Thompson was clearly qualified under the statutory requirements, under any standard of review, we conclude that the trial court erred in dismissing Morris's action under section 766.206(2), Florida Statutes (2011). We now turn to address the trial court's second basis for dismissal in this case.

## III. Dismissal for Failure to Allow Access to Information During the Presuit Process Without Formal Discovery

The trial court also found that dismissal was proper under section 766.205(2), Florida Statutes (2011), because Morris failed to comply with the requirements of the informal presuit discovery process. First, Morris argues that additional discovery into Dr. Thompson's qualifications should not have been permitted because Dr. Thompson's affidavit satisfied the statutory requirements. Even if the additional discovery was proper, Morris argues that she complied. Notwithstanding, Morris argues that it was improper to dismiss the action in the absence of any prejudice to the Defendants. The parties agree that the proper standard of review of a dismissal for failure to comply with discovery is abuse of discretion. *See, e.g.*, *Commonwealth Fed. Sav. & Loan Ass'n v. Tubero*, 569 So. 2d 1271, 1273 (Fla. 1990); *Robinson v. Scott*, 974 So. 2d 1090, 1092 (Fla. 3d DCA 2007).

### A. Section 766.205, Florida Statutes (2011)

Section 766.205(1) requires that, after the completion of the presuit investigation, each party to a medical malpractice action "shall provide to the other party reasonable access to information within its possession or control in order to facilitate evaluation of the claim." § 766.205(1), Fla. Stat. (2011). Section 766.205(2) states that "[s]uch access shall be provided without formal discovery

- 30 -

. . . and failure to so provide shall be grounds for dismissal of any applicable claim or defense ultimately asserted." *Id.* § 766.205(2).

## B. Scope of Permissible Discovery of a Presuit Expert's Qualifications

Morris first argues that additional discovery should not have been permitted because Dr. Thompson's affidavit satisfied the statutory requirements. As stated previously, a prospective plaintiff must corroborate their medical malpractice claim with a "verified written medical expert opinion." § 766.203(2), Fla. Stat. (2011). Subsection (4) states that these medical expert opinions "are subject to discovery" and "shall specify whether any previous opinion by the same medical expert has been disqualified and if so the name of the court and the case number in which the ruling was issued." *Id.* § 766.203(4). The statute does not specify the scope of this discovery.

While the statute does not specify the scope of discovery into a presuit expert's qualifications, certainly, if the defendant presents evidence that the expert's stated qualifications are false, presuit discovery on the discrete issue should be allowed. On the other hand, if the affidavit suggests a technical deficiency in the affidavit, there would be no reason to allow open-ended discovery.

We have explained that, where a plaintiff's presuit expert's affidavit fails to establish that he or she is qualified under the statute, the trial court should hold an

evidentiary hearing to determine whether the expert is qualified. *Williams*, 62 So.

3d at 1137. In *Williams*, the defendant moved to dismiss the medical malpractice

complaint, arguing that the plaintiff's expert's affidavit did not establish that he

was an expert "in the field of cardiology," and, thus, the plaintiff "failed to attach a

corroborating affidavit from a qualified medical expert." *Id.* at 1131. Concluding

that the First District improperly granted certiorari review of the trial court's denial

of the defendant's motion to dismiss, we explained that the First District should

have "dismissed the petition and remanded the case to the trial court for an

evidentiary hearing on whether [the expert] was qualified." *Id.* at 1137; *see also*

*Bery v. Fahel*, 88 So. 3d 236, 237-38 (Fla. 3d DCA 2011) (remanding for an

evidentiary hearing on the presuit expert's qualifications where the presuit expert

attempted to withdraw his affidavit "because he felt he was not qualified to act as

an expert witness"); *Holden*, 39 So. 3d at 402-03 (reversing a dismissal order and

remanding for an evidentiary hearing on the presuit expert's qualifications where

the expert's affidavit did not on its face establish that his qualifications could be

considered a similar specialty to the doctor).

We conclude that neither section 766.203(4) nor our opinion in *Williams*

allows a deposition of a presuit expert where, as in this case, the presuit expert's

affidavit clearly establishes that the expert is qualified under the statute *and* the

defendant fails to present any evidence to refute those qualifications. Indeed,

nothing in the medical malpractice statutory scheme indicates that the Legislature intended the presuit process to include a deposition of a presuit expert regarding her qualifications, where the expert demonstrates in a sworn affidavit that he or she meets the statutory qualifications.

We thus agree with Judge Swanson that, where a presuit expert clearly demonstrates that he or she is qualified in a sworn affidavit, and the defendant has not presented any evidence to refute those qualifications, medical malpractice defendants should not be permitted "to go on a fishing expedition in an attempt to impeach" those qualifications. *Morris*, 189 So. 3d at 351 (Swanson, J., dissenting). This conclusion is consistent with our previous pronouncements that, when reviewing matters involving chapter 766, this Court must construe the provisions "in a manner that favors access to courts." *Patry*, 633 So. 2d at 13; *see Kukral*, 679 So. 2d at 284; *Weinstock*, 629 So. 2d at 838.

We now turn to the second conflict issue in this case regarding prejudice.

### C. The Second Conflict Issue

Morris next argues that the First District's decision, which recognizes that prejudice to the other party should be considered when determining the proper sanction for a party's failure to comply with discovery but fails to actually address the issue of prejudice, conflicts with this Court's opinion in *Kukral*, 679 So. 2d at 284, and the Fourth District Court of Appeal's decision in *Vincent v. Kaufman*, 855

- 33 -

So. 2d 1153, 1156-57 (Fla. 4th DCA 2003), both of which held that dismissal in the absence of any prejudice to the Defendants was improper.  For the reasons that follow, we conclude, as we have many times before, that dismissing an action for a plaintiff's failure to comply with discovery, where the trial court fails to make a finding of prejudice to the defendant, constitutes an abuse of discretion.

While section 766.205(2) permits dismissal for a plaintiff's failure to comply with discovery, this Court has repeatedly held that it is improper to dismiss an action for a plaintiff's failure to comply with discovery where the defendant suffers no prejudice.  *See, e.g.*, *Ham*, 891 So. 2d at 499; *Kukral*, 679 So. 2d at 279; *Patry*, 633 So. 2d at 10.  Indeed, in *Patry*, we quashed the district court's affirmance of the dismissal of a medical malpractice action for lack of strict compliance with the presuit requirements where the defendant suffered no prejudice.  633 So. 2d at 10. We explained that it could not be seriously argued that the goal of the medical malpractice statutory scheme—"to facilitate the orderly and prompt conduct of the screening and settlement process"—was not accomplished where the defendant received notice "that result[ed] in no prejudice."  *Id.* at 12.  Likewise, in *Kukral*, this Court quashed the district court's affirmance of the dismissal of a medical malpractice action, reasoning that "any potential prejudice to the defendants . . . had been eliminated."  679 So. 2d at 284.  We explained that this conclusion was "consistent with our prior holdings favoring access to the courts, while still

- 34 -

carrying out the legislative policy of requiring the parties to engage in meaningful presuit investigation, discovery and negotiations." *Id.* More recently, in *Ham*, we stated that "dismissal is far too extreme as a sanction in those cases where discovery violations have absolutely no prejudice to the opposing party." 891 So. 2d at 499.

Particularly where the two-year statute of limitations for medical malpractice actions has expired and the defendant has suffered no prejudice, courts have consistently recognized that dismissal is a drastic sanction. *See, e.g.*, *Vincent*, 855 So. 2d at 1156-57 (concluding that the dismissal of the plaintiff's medical malpractice action, "the effect of which permanently barred her claim since the statute of limitations had since run, was not warranted where there was no prejudice to the defendant doctor"); *Kukral*, 679 So. 2d at 279 ("The effect of the order of dismissal was to permanently bar the plaintiffs' claim since the statutory limitations period for filing claims had then expired."); *Carr v. Dean Steel Bldgs., Inc.*, 619 So. 2d 392, 394 (Fla. 1st DCA 1993) ("[D]ismissal is a drastic remedy which should be used only in extreme situations.").

Thus, consistent with our precedent, we hold that the trial court must make a finding of prejudice to the defendant before a medical malpractice action can be dismissed under section 766.205(2) for a plaintiff's failure to comply with the informal presuit discovery process. As we have repeatedly explained, "the purpose

of the chapter 766 presuit requirements is to alleviate the high cost of medical negligence litigation through early determination and prompt resolution of claims, *not* to deny access to the courts to plaintiffs." *Weinstock*, 629 So. 2d at 838 (emphasis added).

Moreover, "[b]ecause dismissal is the ultimate sanction in the adversarial system," particularly in the medical malpractice realm after the statute of limitations has expired, we remind trial courts that "it should be reserved for those aggravating circumstances in which a lesser sanction would fail to achieve a just result." *Kozel v. Ostendorf*, 629 So. 2d 817, 818 (Fla. 1993). "[I]n those situations where the attorney, and not the client, is responsible for the error," courts should consider the factors set forth in *Kozel* in determining whether dismissal is warranted. *Id.*

## D. This Case

Here, the trial court found that, during Dr. Thompson's deposition, Morris's counsel "repeatedly objected to questions," "refused to allow" Dr. Thompson to answer certain questions, and "thwarted" the Defendants from learning information such as whether Dr. Thompson was aware of the ABA accreditation rules restricting students to working no more than twenty hours a week while attending law school and whether Dr. Thompson applied for disability during the same period of time preceding the suit due to her arthritis. The trial court further found

that these actions "were purposeful and designed to deprive the Defendants' [sic] of the ability to meaningfully participate in pre-suit discovery of the medical negligence claims against them, and as such was not in good faith." Without making any finding as to whether Morris's actions prejudiced the Defendants, the trial court concluded that dismissal was warranted under section 766.205(2).

On review, the First District concluded that "the record contain[ed] ample evidence" to support the trial court's conclusion that Morris's "lack of cooperation" with the Defendants' attempts to verify Dr. Thompson's qualifications warranted dismissal under section 766.205(2). *Morri*s, 189 So. 3d at 351. In reaching this conclusion, the First District correctly stated that "[a] court's determination of the sanction to impose" for a party's failure to comply with discovery "depends both on the circumstances of the case and what, if any, prejudice the opposing party has suffered." *Id*. at 350. The First District did not identify any prejudice the Defendants suffered as a result of Morris putting a halt to what clearly was, in Judge Swanson's words, a "fishing expedition." *Id.* at 351 (Swanson, J., dissenting).

We first conclude that, because Dr. Thompson's affidavit clearly demonstrated that she was qualified, and the Defendants did not present any evidence to refute those qualifications, the trial court should not have permitted a deposition of Dr. Thompson. Dr. Thompson had been an OB-GYN for over three

decades. While the Defendants attempted to challenge the veracity of Dr. Thompson's assertions that she was practicing in her field of medicine while attending law school, an issue that would have been impeachment on a collateral matter, they presented no evidence demonstrating that these assertions were false.

Additionally, we conclude that the trial court abused its discretion in dismissing Morris's medical malpractice action under section 766.205(2) without finding that Morris's actions prejudiced the Defendants. Indeed, had the trial court or the First District considered the question of prejudice, they would have been hard-pressed to identify any. Although the Defendants attempt to argue that they were prejudiced because Morris's actions delayed the resolution of the claim, delay is not the type of prejudice contemplated by our case law. It was not as if Dr. Thompson's opinion changed from the time that her opinion was filed. Thus, the Defendants in this case had all information they needed in order to "facilitate evaluation of the claim." § 766.205(1).

## IV. Conclusion

It has been observed that "there is an increasingly disturbing trend of prospective defendants attempting to use the [chapter 766] statutory requirements as a sword against plaintiffs." *Michael v. Med. Staffing Network, Inc.*, 947 So. 2d 614, 619 (Fla. 3d DCA 2007). Unfortunately, it appears that this was such a case. Despite the sworn affidavit of Morris's presuit medical expert—which stated that

- 38 -

she had been a board-certified obstetrician and gynecologist for more than twenty years and served as chief of the OB-GYN department at a large medical center and chief of staff at a small women's specialty hospital—the Defendants in this case used the medical malpractice statutory requirements as a sword.

As a result of the Defendants' conduct, and the trial court's and First District's exceedingly restrictive reading of chapter 766, Morris has thus far been deprived of her right to access the courts. To uphold the result in this case would permanently deprive Morris of her right to such access to pursue her medical malpractice claim for the wrongful death of a twenty-year old woman because the statute of limitations has long since run. Such a result not only frustrates Morris's constitutional right to access to the courts, but also does nothing to advance the Legislature's purpose in creating the medical malpractice presuit statutory scheme.

Because Morris's presuit medical expert clearly met the statutory qualifications for medical experts, and because Morris complied with the necessary discovery, the trial court erred in dismissing Morris's action under sections 766.205(2) and 766.206(2), Florida Statutes (2011). Accordingly, we quash the First District's decision and remand with directions that the trial court reinstate Morris's medical malpractice action arising out of a death that occurred over nine years ago.

It is so ordered.

LEWIS, QUINCE, and LABARGA, JJ., concur.
CANADY, C.J., dissents with an opinion, in which POLSTON and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

CANADY, C.J., dissenting.

I disagree with the majority's decision to quash the First District's decision in *Morris v. Muniz*, 189 So. 3d 348 (Fla. 1st DCA 2016), and to reinstate Morris's medical malpractice complaint against the various defendants in this case. I would instead approve the result reached by the First District. Under a proper reading of the statutes governing the medical malpractice presuit process, Morris's purported presuit "medical expert"—Dr. Thompson—as a matter of law did not satisfy the statutory requirements for such experts. Accordingly, I dissent.

This case is readily resolved on the ground that Dr. Thompson failed to meet the threshold statutory requirement of being "duly and regularly engaged" in the practice of the profession at the time the presuit affidavit was executed in 2011. § 766.202(6), Fla. Stat. (2011). The record reveals that at the time Dr. Thompson executed the affidavit, she had been retired from her OB/GYN practice for more than three years and by all indications had transitioned (or was transitioning) into a new career. The fact that Dr. Thompson had a lengthy career as an OB/GYN before retiring in March 2008 does not defeat the plain language of the relevant statutes.

- 40 -

After examining the statutory requirements for a presuit "medical expert" and explaining why Dr. Thompson does not satisfy those requirements, I briefly address the problematic nature of Dr. Thompson's affidavit and the ensuing lack of compliance by the plaintiff and plaintiff's counsel regarding the trial court's order authorizing limited discovery into Dr. Thompson's qualifications. Given this record, I am troubled by the majority's decision to view this case through the lens of an "unrefuted" affidavit. The true extent of Dr. Thompson's activities before March 2008 are unknown. Thus, even assuming that the "duly and regularly engaged" requirement applies to some period of time prior to March 2008, I would approve the First District's decision to affirm the dismissal of the lawsuit.

## I. DR. THOMPSON WAS NOT A "MEDICAL EXPERT" FOR PURPOSES OF CHAPTER 766

Prior to filing a claim for medical malpractice, a prospective plaintiff is required to "conduct an investigation to ascertain that there are reasonable grounds to believe that" the named defendant was negligent and that the negligence caused the plaintiff's injury. § 766.203(2), Fla. Stat. (2011). As part of the mandatory presuit process, a prospective plaintiff must obtain "a verified written medical expert opinion from a medical expert as defined in s. 766.202(6)." *Id.* The purpose of the expert opinion is to "corroborate reasonable grounds to support the claim of medical negligence." *Id.* Prior to initiating litigation, the prospective

- 41 -

plaintiff must first provide the defendant with a "notice of intent to initiate litigation," along with the medical expert's opinion. *Id.*

The term "medical expert" is defined in section 766.202(6) as "a person *duly and regularly engaged* in the practice of his or her profession who holds a health care professional degree from a university or college and who meets the requirements of an expert witness as set forth in s. 766.102." (Emphasis added.) There is nothing backward-looking about the present-tense requirement that the person be "duly and regularly engaged" in the practice of the profession. In other words, the person must *be* duly and regularly engaged in the practice at the time the written medical expert opinion is offered, as opposed to having been duly and regularly engaged in the practice during some earlier period. But this "duly and regularly engaged" requirement, of course, is not the only statutory requirement for being a "medical expert." Section 766.202(6) expressly provides that the person must also hold a certain professional degree *and* "meet[] the requirements of an expert witness as set forth in s. 766.102."

Section 766.102 sets forth requirements for testifying experts in medical malpractice actions. In order to be an expert witness permitted to testify concerning the prevailing professional standard of care, the witness must, at a minimum, be a licensed health care provider. § 766.102(5), Fla. Stat. (2011). For giving expert testimony against a specialist, the expert witness must meet certain

additional requirements, including that the witness "[s]pecialize in the same specialty as the health care provider against whom . . . the testimony is offered." § 766.102(5)(a)1., Fla. Stat. An expert witness offering testimony against a specialist must also meet a specific, backward-looking requirement. Namely, the expert witness must:

> 2. *Have devoted professional time during the 3 years immediately preceding the date of the occurrence that is the basis for the action to*:
> a. The active clinical practice of, or consulting with respect to, the same or similar specialty that includes the evaluation, diagnosis, or treatment of the medical condition that is the subject of the claim and have prior experience treating similar patients;
> b. Instruction of students in an accredited health professional school or accredited residency or clinical research program in the same or similar specialty; or
> c. A clinical research program that is affiliated with an accredited health professional school or accredited residency or clinical research program in the same or similar specialty.

§ 766.102(5)(a)2., Fla. Stat. (emphasis added).

When reviewing the distinct requirements of sections 766.202(6) and 766.102 together, it is clear that the Legislature focused on both the ongoing and previous experience in practice of a presuit "medical expert." The statutory requirements are "clear and unambiguous" and should be given their "plain and obvious meaning." *A.R. Douglass, Inc., v. McRainey*, 137 So. 157, 159 (Fla. 1931). Thus, in this case involving a medical specialty, Dr. Thompson at the time she executed the affidavit was required to: (1) be duly and regularly engaged in the

- 43 -

practice of the profession; and (2) "[h]ave devoted professional time during the 3 years immediately preceding the" alleged malpractice to one of the three categories of professional activities listed in section 766.102(5)(a)2.—under the facts presented here, to "[t]he active clinical practice of" OB/GYN.[8]

Nothing in Dr. Thompson's affidavit or in the rest of the record supports the conclusion that she was "duly and regularly engaged" in the practice of the profession at the time she executed the affidavit in 2011. Dr. Thompson's affidavit on its face paints the picture of someone who retired in March 2008 from a lengthy private medical practice and who had transitioned (or was transitioning) into a new career. That conclusion is supported by the rest of the record, including the following interrogatory response from the plaintiff regarding Dr. Thompson's profession or occupation: "Retired OB/GYN, March 1, 2008, before law practice." Although Dr. Thompson maintained an active license to practice medicine in the State of Texas at the time she executed the affidavit, that license merely *authorized* her to engage in the practice of the profession. Indeed, having an active license is itself a separate statutory requirement for a "medical expert." § 766.102(5), Fla.

_____

8. The majority concludes that "[t]here is no indication that the Legislature . . . intended to make the qualifications for a presuit expert more stringent than an expert testifying at trial." Majority op. at 19. But that conclusion ignores the text of section 766.202(6), which, by definition, provides that a presuit "medical expert" must meet certain requirements in addition to those for an expert testifying at trial. *See* § 766.202(6), Fla. Stat.

- 44 -

Stat. And although Dr. Thompson mentioned during her deposition in October 2013 that she served as an expert for the Texas Board of Medicine after her retirement from private practice, serving as an expert can hardly be said to be "engag[ing] in the practice of" the profession. § 766.202(6), Fla. Stat.; *see Winson v. Norman*, 658 So. 2d 625, 626 (Fla. 3d DCA 1995) (concluding that the alleged presuit expert who "confined his recent professional activities to acting as a 'litigation expert' " did not satisfy the requirement in chapter 766 of being duly and regularly engaged in the practice of the profession). In any event, Dr. Thompson described her work for the Texas Board of Medicine as "sporadic," which is quite the opposite of "regularly." In short, Dr. Thompson was not a qualified "medical expert" for purposes of chapter 766. As a result, her affidavit was insufficient to "corroborate reasonable grounds to support the claim of medical negligence." § 766.203(2), Fla. Stat.[9]

---

9. The majority dismisses the notion that Dr. Thompson was required to "be duly and regularly engaged at the time the opinion is offered" in part on the ground that "the role of the medical expert is to provide an opinion regarding the prevailing professional standard of care, or the professional standard of care existing *at the time of the occurrence that is the basis for action*." Majority op. at 21 (emphasis added). But even assuming that Dr. Thompson was only required to be "duly and regularly engaged" in the practice "at the time of the occurrence," she still would not meet the statutory requirement. As the majority recognizes, Dr. Thompson "retire[d] from clinical practice in March 2008," majority op. at 10, "which was several months before the incidents alleged in the complaint began," majority op. at 26.

The majority's repeated assertions that Dr. Thompson "clearly met" the statutory requirements, *see* majority op. at 29, 39, cannot be reconciled with the plain statutory language. And no case law supports allowing a medical malpractice lawsuit to proceed where, as is the case here, the plaintiff fails to provide the requisite corroborating affidavit prior to the expiration of the limitations period for filing suit. *See Kukral v. Mekras*, 679 So. 2d 278, 285 (Fla. 1996) ("We hold that plaintiffs' compliance with the presuit investigation requirements of chapter 766 prior to filing suit and within the statutory limitations period constituted sufficient compliance with the presuit notice and investigation requirements of the statute.").

The trial court and the parties in this case all appear to have conflated the present-tense "duly and regularly engaged" requirement of section 766.202(6) with the separate requirement in section 766.102(5)(a)2. regarding whether the person devoted professional time to the active clinical practice of the specialty during the three years immediately preceding the alleged malpractice. Indeed, they all seemingly understood the sole relevant inquiry to be whether Dr. Thompson was engaged in the full-time, active practice of medicine during that three-year period (either at some point in time or throughout that period).

This exclusive focus on a lookback period is likely attributable to the First District's decisions in *Fort Walton Beach Medical Center, Inc. v. Dingler*, 697 So. 2d 575 (Fla. 1st DCA 1997), and *Baptist Medical Center of Beaches, Inc. v.*

- 46 -

*Rhodin*, 40 So. 3d 112 (Fla. 1st DCA 2010).  The reasoning of these cases on this point should be rejected.

In *Dingler*, the First District examined the definition of "medical expert" found in section 766.202(5), Florida Statutes (1991), and specifically rejected the defendants' argument that a presuit "medical expert" was required to be duly and regularly engaged in the practice of the profession "at the time the corroborating opinion and affidavit are signed." *Dingler*, 697 So. 2d at 580.  *Dingler* erroneously conflated sections 766.102 and 766.202 by concluding that the present-tense "duly and regularly engaged" requirement in section 766.202 was satisfied "so long as the expert's 'active involvement' in the practice occurred" within the lookback period "as provided by" section 766.102(2).  *Id.*

More recently in *Rhodin*, the First District cited *Dingler* with approval in rejecting the defendant's challenge to the affidavit provided by the presuit "medical expert," Dr. Byrne.  *Rhodin*, 40 So. 3d at 118.  And in rejecting the defendant's specific argument that Dr. Byrne was not "duly and regularly engaged" in the practice of nursing, the First District again erroneously conflated that statutory requirement in section 766.202 with the "devoted professional time" requirement in section 766.102.  *Id.* at 119-20.  *Rhodin* failed to consider the fact that in 2003, the Legislature adopted a definition of "medical expert" in section 766.202 that not only retained the "duly and regularly engaged" language but also

provided that a presuit "medical expert" must *also* "meet[] the requirements of an expert witness as set forth in s. 766.102." *See* ch. 2003-416, § 58, at 76, Laws of Fla. The 2003 amendments make clear beyond any doubt that the "duly and regularly engaged" requirement in section 766.202 and the "have devoted professional time" requirement in section 766.102 are not one and the same. Conflating the two requirements renders the "duly and regularly engaged" language a nullity. *See State v. Goode*, 830 So. 2d 817, 824 (Fla. 2002) ("[A] basic rule of statutory construction provides that the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless.").

## II. DR. THOMPSON'S INSUFFICIENT AFFIDAVIT

Even assuming that Dr. Thompson's activities during the three years immediately preceding the alleged malpractice in this case should control whether this case is permitted to proceed, I would approve the First District's decision.

In determining that the proper standard of review is de novo, the majority repeatedly remarks that the facts surrounding Dr. Thompson's qualifications were "unrefuted." In doing so, the majority ignores that Dr. Thompson's affidavit was problematic on its face, the facts were in dispute, and the plaintiff and plaintiff's counsel—both leading up to and during Dr. Thompson's court-authorized deposition—obstructed the defendants' requests for relevant information. This

- 48 -

case hardly involved "a fishing expedition in an attempt to impeach" Dr. Thompson's qualifications. Majority op. at 33 (quoting *Morris*, 189 So. 3d at 351 (Swanson, J., dissenting)).

According to Dr. Thompson's affidavit, she "engaged in full-time patient care until March 2008" when she retired due to arthritis in her hands. According to the very same affidavit, Dr. Thompson received her J.D. in 2007 and her M.P.Aff. (Master of Public Affairs) in 2008, both from the University of Texas. In other words, at the same time she was purportedly still caring for patients on a "full-time" basis, Dr. Thompson was also enrolled on a *full-time* basis in law school and in a Master of Public Affairs program. In addition to begging obvious questions, not the least of which is how it is humanly possible to simultaneously do all of those things, Dr. Thompson's affidavit facially conflicted with then Standard 304(f) of the American Bar Association's Standards for Approval of Law Schools, which prohibited full-time law students from working more than twenty hours per week. Any reasonable defense attorney—and any reasonable trial judge, as was the case here—would have been skeptical. And when the plaintiff chose to respond to the defendants' requests for information—both with regard to Dr. Thompson and other matters—the answers were either nonresponsive or begged more questions. For example, the defendants were told that Dr. Thompson somehow managed to deliver approximately *thirty-five babies per month* while she

was enrolled full-time in law school and in a master's program. It should go without saying that the trial court acted within its discretion in authorizing limited discovery directed at Dr. Thompson's activities during the three-year period preceding the alleged malpractice. And that discovery included a properly noticed deposition of Dr. Thompson along with a request for documents to be produced at the deposition.

The record reflects that the plaintiff waited until approximately ninety minutes before the deposition to file an objection to the defendants' request for documents. The record also reflects that during the deposition, the plaintiff's counsel repeatedly objected—and instructed Dr. Thompson not to answer—when certain relevant questions were asked regarding Dr. Thompson's purported activities during the three-year period preceding the alleged malpractice. When Dr. Thompson was permitted to answer questions, she testified that, among other things, she "probably" worked "more than" one hundred hours per week between her practice and her J.D. and M.P.Aff. degrees. That included being on call for unaffiliated patients at the hospital two to three days per month, as well as being on call for her own patients every third to fourth night or day until the final year of her practice when she "took call . . . 24/7" for her own patients—all while suffering from arthritis in her hands that became "severe" in the final years of her practice. Of course, Dr. Thompson was not permitted to answer, for example, whether she

filed for disability with regard to her arthritis and, if so, whether the application—which would have discussed her work history—was available for inspection. Similarly, Dr. Thompson was instructed to not answer questions such as whether she was aware of any requirements by her law school regarding not working outside the law school more than twenty hours per week, although her subsequent testimony implied that the dean of the law school knew and approved of her plan to continue practicing OB/GYN on a "full-time" basis—again, notwithstanding the American Bar Association's Standards for Approval of Law Schools. Dr. Thompson also was not permitted to discuss whether her compensation from and the finances of her medical practice changed as a result of her starting law school. That was the case even though Dr. Thompson revealed earlier in the deposition that she had hired "a contract physician" "during some of that time" but could not quite recall the specifics of that hire, including when she hired the physician, the terms of payment, or whether the physician had a set schedule for a period of time at least as long as a law school semester. And Dr. Thompson was not permitted to answer whether she at some point sold her practice to that contract physician.

On this record, I disagree with the majority's description of the defendants' attempts to confirm the claims made by Dr. Thompson as being "a fishing expedition." Majority op. at 33. And I reject the majority's view that Dr. Thompson's affidavit conclusively established her statutory qualifications. The

true extent of Dr. Thompson's activities during the relevant period remains very much in doubt. I therefore disagree with the majority's analysis, which is entirely predicated on the assertions that Dr. Thompson clearly met the statutory requirements and that her affidavit went "unrefuted." This case should properly be viewed as a case in which a facially insufficient affidavit was submitted and the defendants were prevented from determining whether Dr. Thompson in fact met the statutory requirements. And no case law supports allowing a medical malpractice suit to proceed in the absence of a timely corroborating affidavit from a presuit "medical expert" as defined in section 766.202(6).

In attempting to justify its decision, the majority notes that the presuit statutes should be "interpreted liberally" so as to favor access to courts. *See* majority op. at 16 (quoting *Kukral*, 679 So. 2d at 284). But this case has nothing to do with roadblocks to court access. Instead, this case has to do with a plaintiff submitting a facially insufficient and suspect affidavit and then repeatedly declining—even in the face of a court-imposed order—to provide relevant information that would have confirmed or refuted the affidavit. "Liberally" interpreting the presuit process does not warrant allowing plaintiffs to obstruct defendants from obtaining relevant information regarding questionable claims and then rewarding that obstruction through an analysis that treats those claims as

"unrefuted." The majority's decision to simply reinstate the plaintiff's suit seriously undermines the presuit process established by the statute.

### III. CONCLUSION

Although the plaintiff's purported presuit "medical expert"—Dr. Thompson—appears to have enjoyed a lengthy career as an OB/GYN, she did not meet the statutory qualifications for a "medical expert," given that she was not "duly and regularly engaged" in the practice of the profession at the time she executed the presuit affidavit. The plaintiff thus failed to meet the presuit burden of having corroborated that reasonable grounds existed to support a malpractice claim, and the plaintiff failed to remedy that defect prior to filing suit and prior to the expiration of the limitations period. Even assuming that the only relevant period is the three years immediately preceding the alleged malpractice, the record before us—due to the conduct of the plaintiff and plaintiff's counsel—cannot support the finding that Dr. Thompson met the statutory qualifications. I would approve the result reached by the First District in affirming the dismissal of the plaintiff's complaint. Accordingly, I dissent.

POLSTON and LAWSON, JJ., concur.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

First District - Case No. 1D14-3987

(Jackson County)

John S. Mills, Courtney Brewer, and Andrew D. Manko of The Mills Firm, P.A., Tallahassee, Florida,

>   for Petitioner

Peter D. Webster and Christine Davis Graves of Carlton Fields, Tallahassee, Florida,

>   for Respondent Bay Hospital d/b/a Gulf Coast Medical Center

Clifford C. Higby and Kevin Barr of Bryant & Higby, Chartered, Panama City, Florida; and William D. Horgan and Michael J. Thomas of Pennington, P.A., Tallahassee, Florida,

>   for Respondents Stephen G. Smith, M.D., Orlando S. Muniz, M.D., and Marianna OB/GYN Associates, Inc.

Jaken E. Roane of Guilday, Simpson, West, Hatch, Lowe & Roane, P.A., Tallahassee, Florida,

>   for Respondent Jackson Hospital

Philip M. Burlington and Adam Richardson of Burlington & Rockenbach, P.A., West Palm Beach, Florida,

>   Amicus Curiae Florida Justice Association

Travase L. Erickson of Saalfield Shad Law Firm, Jacksonville, Florida, and Kansas R. Gooden of Boyd & Jenerette, P.A., Jacksonville, Florida,

>   Amicus Curiae Florida Defense Lawyers Association