# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

Case No. 5D2023-1263
LT Case No. 2021-11260-CIDL

———————————————

CHRISTOPHER MONCRIEF, as
Personal Representative of the
Estate of Melissa Marie
Moncrief,

    Appellant,

    v.

CHARLES EDWARD KOLLMER,
M.D., and NEW SMYRNA
ORTHOPEDICS, P.A.,

    Appellees.

———————————————

On appeal from the Circuit Court for Volusia County.
Kathryn D. Weston, Judge.

Christopher V. Carlyle, of The Carlyle Appellate Law Firm,
Orlando, for Appellant.

Wilbert R. Vancol, Rafael E. Martinez, and Zachary D. Trapp, of
McEwan, Martinez, Dukes & Hall, P.A., Orlando, for Appellees.

November 15, 2024

PRATT, J.

    Christopher Moncrief, as personal representative of the estate
of Melissa Marie Moncrief ("Plaintiff"), appeals the circuit court's

grant of summary judgment in favor of Dr. Charles Edward Kollmer, M.D., and New Smyrna Orthopedics, P.A. (collectively, "Defendants"). This medical-malpractice appeal requires us to decide whether Plaintiff's alleged expert, Dr. Richard Shure, M.D., was a "medical expert" qualified under sections 766.102(5) and 766.202(6), Florida Statutes (2019), to provide a pre-suit, corroborating "verified written medical expert opinion," as required by section 766.203(2). Because Dr. Shure's work during the relevant timeframe was confined to legal consulting with no provision of health care to patients, we hold that he was not qualified and, therefore, affirm.

## I.

Defendants performed two orthopedic surgeries on Plaintiff between May 1, 2019, and September 24, 2019. On May 13, 2021, Plaintiff gave notice of her intent to initiate a medical-malpractice suit related to those surgeries. Her notice of intent included a corroborating written medical expert opinion from Dr. Shure, along with Dr. Shure's curriculum vitae.

Dr. Shure's CV reflected that, from July 4, 1988, to December 31, 2014, he worked at Jewett Orthopaedic Clinic, and then from January 23, 2015, until the time he issued his written opinion for Plaintiff, his sole employment was as an expert witness at R.L. Shure, M.D., Consulting, LLC. Defendants served several pre-suit discovery requests concerning whether Dr. Shure was qualified to provide a corroborating opinion under sections 766.102 and 766.202. Plaintiff's responses confirmed that, since he left Jewett Orthopaedic Clinic, Dr. Shure had confined his professional practice to working as a legal consultant and to conducting medical evaluations associated with civil litigation. The responses also confirmed that, between May 1, 2016, and May 1, 2019, Dr. Shure had not performed any orthopedic surgical procedures or had privileges at any hospital or surgical center.

Plaintiff then commenced her suit on August 24, 2021. Defendants moved to dismiss. Before any hearing on the motion, the parties agreed to a deposition of Dr. Shure solely on the issue of his qualifications as a corroborating medical expert under Chapter 766. During the deposition, Dr. Shure testified that he

had been actively and continuously engaged in the practice of orthopedic surgery through the date that he had rendered his opinion for Plaintiff. However, his testimony made clear that he had not evaluated or treated any individual in the context of a physician-patient relationship since December 31, 2014—four years before Plaintiff's surgeries, and more than six years before Plaintiff filed her suit. Instead, Dr. Shure's practice during that timeframe consisted solely of legal consulting. To perform that consulting work, he reviewed medical records, performed medical evaluations, and provided medical findings to attorneys, insurance companies, or other third parties, rather than to the subject individuals themselves. Although Dr. Shure occasionally spoke with a treating physician, he testified that he did not provide any advice or consultation regarding the individual's prospective medical care. In other words, the individuals whom Dr. Shure examined—and about whose past care he opined—were not his own patients. They were instead the patients of other physicians. Finally, Dr. Shure confirmed that since December 31, 2014, he had not held any academic appointments in which he provided instruction at an accredited health professional school, residency program, or clinical research program.

Based on the additional information obtained during the deposition, Defendants filed an amended motion to dismiss, again challenging Dr. Shure's qualifications to provide a pre-suit affidavit. The circuit court held a hearing and then granted the motion, concluding that during the relevant timeframe, Dr. Shure had not been duly and regularly engaged in the practice of medicine and had not devoted professional time to the active clinical practice of orthopedic surgery. The dismissal was without prejudice because the court could not determine from the face of the complaint whether the statute of limitations had run.

Following transmittal of a new corroborating pre-suit medical expert report on June 15, 2022, Plaintiff filed an amended complaint on September 27, 2022. Defendants moved for summary judgment on the ground that the statute of limitations had run on April 1, 2022. The circuit court agreed and granted summary judgment to Defendants. Plaintiff timely appealed.

## II.

On appeal, Plaintiff assigns error to the circuit court's conclusion that Dr. Shure was unqualified to serve as a pre-suit corroborating expert under sections 766.102 and 766.202. Such matters of statutory interpretation are "subject to de novo review." *State v. Ingram*, 299 So. 3d 546, 547 (Fla. 5th DCA 2020).

Section 766.203(2) requires a medical-malpractice claimant to conduct a pre-suit investigation. As part of that investigation, the claimant must submit "a verified written medical expert opinion from a medical expert as defined in section 766.202(6), at the time the notice of intent to initiate litigation is mailed, which statement shall corroborate reasonable grounds to support the claim of medical negligence." § 766.203(2), Fla. Stat. (2019). Section 766.202(6), in turn, defines "[m]edical expert" as "a person duly and regularly engaged in the practice of his or her profession who holds a health care professional degree from a university or college and who meets the requirements of an expert witness as set forth in section 766.102." § 766.202(6), Fla. Stat. And section 766.102 provides, in relevant part:

> (5) A person may not give expert testimony concerning the prevailing professional standard of care unless the person is a health care provider who holds an active and valid license and conducts a complete review of the pertinent medical records and meets the following criteria:
>
> (a) If the health care provider against whom or on whose behalf the testimony is offered is a specialist, the expert witness must:
>
> 1. Specialize in the same specialty as the health care provider against whom or on whose behalf the testimony is offered; and
>
> 2. Have devoted professional time during the 3 years immediately preceding the date of the occurrence that is the basis for the action to:

4

a. The active clinical practice of, or consulting with respect to, the same specialty;

b. Instruction of students in an accredited health professional school or accredited residency or clinical research program in the same specialty; or

c. A clinical research program that is affiliated with an accredited health professional school or accredited residency or clinical research program in the same specialty.

§ 766.102(5)(a), Fla. Stat.

Dr. Shure does not meet these statutory qualifications. First, he was not regularly engaged in the practice of his profession—medicine—as required by section 766.202(6). While Chapter 766 provides no definition for the term, section 458.305 defines "[p]ractice of medicine" as "the diagnosis, treatment, operation, or prescription for any human disease, pain, injury, deformity, or other physical or mental condition." § 458.305(3), Fla. Stat. (2019). Insofar as it applies to licensed physicians, we presume that section 766.202 accords the same meaning to the phrase, "practice of his or her profession." § 766.202(6). Although Dr. Shure's legal consulting work no doubt was *related to* the practice of his profession, it was not itself a medical practice. At no time since December 31, 2014, has Dr. Shure diagnosed, treated, operated upon, or prescribed medication for a patient as his or her physician. Therefore, at no time since that date has Dr. Shure practiced medicine, much less "regularly" so. *See* § 766.202(6); *see also Winson v. Norman*, 658 So. 2d 625, 626 (Fla. 3d DCA 1995) (holding that a physician who "had not been engaged in the actual practice for more than a decade prior and had apparently confined his recent professional activities to acting as a 'litigation expert'" "was not 'duly and regularly engaged in the practice of his profession'" (quoting § 766.202(5), Fla. Stat. (1993))).

Second, Dr. Shure was not a "health care provider" as required by section 766.102(5) because, as a legal consultant, he did not

5

provide any health care.[1] We are aware that section 766.202 defines "[h]ealth care provider" as, among other persons, "any person licensed under chapter 458." § 766.202(4). However, this definition applies only to sections 766.201 through 766.212. And, critically, those statutes use the term "health care provider" only in relation to medical-malpractice tortfeasors, thus presupposing that the licensed individual has provided health care to the claimant. *See, e.g.*, § 766.2021, Fla. Stat. (2019) ("An entity licensed or certified under chapter 624, chapter 636, or chapter 641 shall not be liable for the medical negligence of a health care provider with whom the licensed or certified entity has entered into a contract in any amount greater than the amount of damages that may be imposed by law directly upon the health care provider . . . ."). In its proper context, then, section 766.202(4) does not broaden the plain meaning of "health care provider"—one who provides health care. Instead, it narrows that plain meaning by specifying particular kinds of licensees who provide health care to patients. Likewise, and most pertinent to this appeal, section 766.102—on its face—treats one's status as a health care provider as distinct from his licensure. *See* § 766.102(5) ("A person may not give expert testimony concerning the prevailing professional standard of care unless the person is a health care provider who holds an active and valid license . . . ."). Therefore, section 766.102 also accords "health care provider" its common meaning.

In the end, we must conclude that section 766.102 uses the term "health care provider" according to its plain meaning: one who provides health care to patients. Thus, a legal consultant who has no patients is not a health care provider. Because Dr. Shure

---

[1] We received adversarial briefing on the question whether Dr. Shure met section 766.102(5)'s qualifications. However, the briefs focused on sub-subparagraph (5)(a)2.a. and overlooked this threshold issue. Mindful that we may affirm on any basis supported by the record, *see Shands Teaching Hosp. & Clinics, Inc. v. Mercury Ins. Co. of Fla.*, 97 So. 3d 204, 212 (Fla. 2012), during oral argument, we gave the parties an opportunity to be heard on the predicate question whether Dr. Shure is a "health care provider" within the meaning of section 766.102(5). Defendants argued that he is not, and we agree.

did not provide any health care to any patient after December 31, 2014, he failed to meet section 766.102(5)'s requirement that an expert be a health care provider.

## III.

Plaintiff urges us to look beyond the statutory text to the purpose of the pre-suit screening requirements, stressing that the Florida Supreme Court has instructed us to construe them "in a manner that favors access to courts." *Morris v. Muñiz*, 252 So. 3d 1143, 1146 (Fla. 2018). In the face of clear statutory text, we find Plaintiff's purposivist argument particularly unpersuasive. "[N]o legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam). "Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice— and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Id.* at 526.

We also find Plaintiff's reliance on *Morris* misplaced. In *Morris*, there was no dispute that the plaintiff's expert had a thirty-year career as a physician who "was engaged in full-time patient care"—and, therefore, was a health care provider regularly engaged in the practice of medicine during that career. 252 So. 3d at 1147. There also was no dispute that the expert had retired from the clinical practice of medicine in March 2008—about ten months before the injury and death that gave rise to the medical-malpractice claim. *Id.* at 1148. However, the defendants questioned the credibility of the expert's assertion that she treated patients during the three years preceding the injury and death, as the expert had attended law school as a full-time student during that period. *Id.* at 1147, 1149, 1156. The Court in *Morris* held that, because the defendants "presented no evidence to refute" the expert's sworn statements that she had regularly treated patients until March 2008 while attending law school, the undisputed facts established that she was qualified under sections 766.102 and 766.202. *Id.* at 1156.

Unlike the expert in *Morris*, Dr. Shure ceased treating patients more than three years before the incidents giving rise to

7

the claim. Therefore, *Morris* has no application to the case before us. Plaintiff's arguments to the contrary miss the mark.

Finally, Plaintiff provides no support for the premise that our plain-language reading of the relevant statutes would deny access to the courts. Indeed, having quickly procured an apparently qualified replacement expert following the circuit court's dismissal, Plaintiff is poorly positioned to raise the access-to-courts argument she presses. In any event, Plaintiff's argument is untenable, as it appears to assume an access-to-courts defect in any qualification requirement that has the effect of narrowing the universe of available experts in a way that might foreclose a medical-malpractice claim. That theory, if accepted, would eviscerate the Legislature's authority to impose conditions on the initiation of medical-malpractice suits. We find no support, in either law or logic, for such a broad assertion. While the Court in *Morris* did emphasize that we must construe sections 766.102 and 766.202 in a manner that favors access to the courts, *see, e.g., id.* at 1146, 1151, 1154, 1159, never did it endorse so sweeping a proposition. We also note that, since *Morris*, the Court has reminded us that, "[i]n interpreting [a] statute, we follow the 'supremacy-of-text principle'—namely, the principle that '[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.'" *Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 946 (Fla. 2020) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012)). Our decision today faithfully applies that principle.

## IV.

For the foregoing reasons, we affirm the circuit court's summary judgment.

AFFIRMED.

LAMBERT and EISNAUGLE, JJ., concur.

8

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____